**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| **ZIMMER TECHNOLOGY, INC. &** | ) | |
| **ZIMMER, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **3:02 CV 425** |
| | ) | |
| **HOWMEDICA OSTEONICS** | ) | |
| **CORPORATION** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM, OPINION, AND ORDER**</u>

The record in this case is complicated, and the processes involved are rather challenging.  An examination of the dissents by the two senior members of the United States Court of Appeals for the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) indicates the enormity of the difficulties involved in this process. For all of these reasons, once this Court has completed its obligation to properly construe the remaining disputed claim terms, it is incumbent upon all of the counsel in this case to give the closest possible attention to the issues that have been raised in the motions for summary judgment.  This Court will, in this regard, set a schedule for further and closer briefing on those issues and further oral argument.

On April 3, 2003, this Court entered an Order denying Plaintiff, Zimmer, Inc.'s ("Zimmer"), Motion for Summary Judgment of Infringement of U.S. Patent No. 5,290,313 (the "'313 patent"), entitled "Offset Prosthetic Stem Extension," and granting

Defendant, Howmedica Osteonics Corporation's ("Howmedica") Motion for Summary

Judgment of Noninfringement.  *Zimmer, Inc. v. Howmedica Osteonics Corp.*, 258 F.

Supp. 2d 874 (N.D. Ind. 2003).  Zimmer appealed this Court's decision, and on May 26,

2004, the United States Court of Appeals for the Federal Circuit reversed and remanded

the case to this Court for further proceedings in accordance with its opinion.

In its opinion, the Federal Circuit construed certain claim terms but declined to

construe other claim terms that may have been in dispute at the time of summary

judgment.  The Federal Circuit also stated that it was not appropriate for it, on appeal, to

determine whether the claims of the '313 patent are infringed by Howmedica's Duracon

Total Stabilizer Revision System ("the infringing Duracon system") and the Scorpio

Single Axis Total Knee System ("the infringing Scorpio system")(collectively, "the

accused products").  Rather, the Federal Circuit simply found that there existed genuine

issues of material fact sufficient to preclude a grant of summary judgment of

noninfringement.

Since that time, the record in this case has grown substantially.  The parties have

renewed their respective motions, and on June 9, 2005, this Court held oral arguments in

South Bend, Indiana.  Zimmer seeks to have the '313 patent declared valid and

enforceable in law and infringed by Howmedica's products.  Contrastingly, Howmedica

asserts that claims 1-4, 6, 8, and 13-17 of the '313 patent are invalid under 35 U.S.C. §

102(b) and/or § 103 in view of U.S. Patent No. 4,106,128 to Greenwald, et al. ("the

2

Greenwald patent"). Recognizing that the Federal Circuit's Mandate and the findings contained therein are part of the law of this case, it is now the responsibility of this Court to properly construe the claims of the '313 patent and rule on Howmedica's Renewed Motion for Summary Judgment of Invalidity of Claims 1-4, 6, 8, and 13-17 and Noninfringement of Claims 5, 7, and 9-12 of the '313 patent and Zimmer's Motion for Partial Summary Judgment on Howmedica's Defense and Counterclaim that the Greenwald Patent Anticipates or Renders Obvious the Asserted Claims of the '313 patent.

## I. JURISDICTION

Howmedica is a New Jersey corporation with its principal place of business in New Jersey. Complaint ¶2. It is a wholly-owned subsidiary of the Stryker Corporation of Kalamazoo, Michigan, which designs, manufactures, and sells various medical products. *Id*. Zimmer is a Delaware corporation with its principal place of business in Indiana. Complaint ¶1. Zimmer also designs, manufactures, and sells various medical products and is the assignee of the '313 patent. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1338(a), and venue is based on 28 U.S.C. §§1391(b) and (c).

## II. BACKGROUND

There is a vast factual record in this case, and this Court, in rendering its decision, has taken careful consideration of all such facts. This Court also takes judicial notice of the record in this case.

Zimmer holds the '313 patent, entitled "Offset Prosthetic Stem Extension."  The application for the '313 patent was filed on November 23, 1992, and the United States Patent and Trademark Office issued Zimmer's '313 patent on March 1, 2004.  The '313 patent was issued with seventeen (17) claims, with Claim 1 as an independent claim and Claims 2-17 dependent upon Claim 1.  The '313 patent is directed to a modular system for surgically-implanted prosthetic joints and covers an offset prosthetic stem extension. The '313 patent was designed primarily, though not exclusively, for use with prosthetic knee joints.

The '313 patent describes a modular implant system wherein the base portion (10) and a stem extension (1) are joined together and inserted into a bone.  The base portion  is comprised of a base mounting means (12), and the stem extension is comprised of a stem mounting portion (2) and an elongated stem portion (3).  These are joined by the connection portion (4).  '313 patent, col. 2, ll. 50 - col. 3, ll. 9.  This base portion is then attached to the stem extension by mounting the base mounting portion on the stem mounting portion.  The extending, tapered pin (33) of the stem mounting portion mates with the corresponding tapered recess (43) of the base mounting portion in a "Morse taper."  The axis of the Morse taper (A) is offset from the axis of the elongated stem portion (B) by offset (O).  The substantially parallel, central longitudinal, offset axis of the '313 patent allows the elongated stem portion to be inserted into the intermedullary canal of the tibia, while allowing the base portion to remain centered relative to the

resected bone surface.  '313 patent, Fig. 9, col. 3, ll. 9-44.  During surgery, the '313

patent can be rotated around its attachment point to the base portion, allowing it to be

moved relative to the stem extension and thus allowing the surgeon to achieve maximum

coverage of the resected surface.  However, once the desired position is selected, the stem

extension is fixed with respect to the base portion.

Howmedica manufactures the Duracon Total Stabilizer ("Duracon") and the

Scorpio TS ("Scorpio") as a licensed user of U.S. Patent No. 5,782,920 ("the '920

patent").  The '920 patent was issued by the United States Patent and Trademark Office

("Patent and Trademark Office") after the '313 patent was issued.  The '920 patent

describes a system that includes a base portion/tray element (12) that is joined to an

elongated stem portion (14).  Before assembly, the adapter element (16) is separated from

the stem portion and is attached to the elongated stem portion by a threaded connection.

The base portion (12) is then attached to the connection portion by a second threaded

connection rather than by a Morse taper.

Howmedica asserts that the Greenwald patent, Patent No. 4,106,128 ("the

Greenwald patent") is prior art and that every element of the claimed invention of the

'313 patent is found in that prior art.  The Greenwald patent was issued by the United

States Patent and Trademark Office on August 15, 1978 and is entitled "Endoprosthetic

Bone Joint."  It was designed primarily to cover prosthetic joints of the type used to

replace dysfunctional, non-weight bearing joints, such as the knuckle, wrist, elbow or

shoulder.  01/27/03 Howmedica Reply, Exhibit 2E, Greenwald Patent Abstract.  The Greenwald patent contains a radial component (10) that includes a radial intramedullary stem (11) and a radial cup (13).  The joint is comprised of a metacarpal component (30), which includes a spherical ball (31), an intramedullary stem (3) and a socket (21).  The socket surrounds the ball of the metacarpal component and mates with the inside cup portion of the radial component.

On or about June 17, 2002, Zimmer filed a patent infringement lawsuit against Howmedica, alleging that the accused products infringed claim 1 of the '313 patent along with claims 2-4, 6, 8, 13, 14 and 17, all of which are dependent upon claim 1.  On October 16, 2002, Howmedica moved for summary judgment of noninfringement or, in the alternative, invalidity of the '313 patent.  Then, on January 6, 2003, Zimmer filed a cross motion for summary judgment of infringement.

In April 2003, this Court granted Howmedica's Motion for Summary Judgment of Noninfringement and denied Zimmer's Motion for Summary Judgment of Infringement.  On May 26, 2004, the Federal Circuit overturned the judgment of noninfringement and remanded the case back to this Court for further proceedings consistent with its opinion.  In its opinion, the Federal Circuit construed certain claim terms but declined to construe other claim terms that may have been in dispute at the time of summary judgment.  Because the claim construction was incorrect in the first instance, and due to the fact that the Federal Circuit declined to construe all disputed claim terms on appeal, the onus is on

6

this Court to undertake a claim construction of the remaining disputed terms. Those terms already construed by the Federal Circuit are now law of the case. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998)(where the court established the construction of all claim terms in dispute, making the prior construction law of the case).

## III.  STANDARD OF REVIEW

Summary judgment in favor of those accused of infringement is appropriate where there is no genuine issue of material fact, the trial court has properly construed the claims, and a finding of infringement would be impossible. *Lockwood v. American Airlines Inc.*, 107 F.3d 1565, 1576 (Fed. Cir. 1997). During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir. 1996).

The purpose of construing the claims of a patent is to determine the meaning and scope of the patent claims that the plaintiff asserts have been infringed. *Markman*, 52 F.3d 967, 979 (Fed. Cir. 1995). The focus of the court when it construes a disputed claim term is not the subjective intent of the parties when they employed a certain term, but the objective test of what one of ordinary skill in the art at the time of the invention would have understood the claim to mean. *Markman*, 52 F.3d at 986. The court must first look to the intrinsic evidence: the asserted and unasserted claims, the specification, and the

7

prosecution history.  *Phillips*, 415 F.3d at 1314.  The claims "particularly point out and distinctly clai[m] the subject matter which the applicant regards as his invention.'" *Markman*, 517 U.S. at 373 (*citing* 35 U.S.C. §112).   Claim construction, then, is the "process of giving proper meaning to the claim language" and is the fundamental process by which the court "defines the scope of the protected invention."  *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

The Federal Circuit's en banc opinion in *Phillips* clarified the approach that courts must use in analyzing claim language.  In *Phillips*, the court criticized the methodology from *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), which district courts had routinely relied on in claim construction cases.  The court critiqued the *Texas Digital* opinion for its over-reliance on extrinsic sources, such as dictionaries, treatises, and encyclopedias, along with the limited role assigned to the specification.  *IP Innovation LLC v. Sony Electronics*, Slip Op. No. 04-6388, 2005 WL 2035578 at *1 (N.D. Ill. 2005).  The court expressed discontent with *Texas Digital's* instruction for the courts to begin claim construction analyses by consulting dictionaries to determine the ordinary and customary meaning of a term and only examining the specification and prosecution history as a secondary step.  Rather, the court mandated that substantial weight be given to the claims, the entire specification, and the prosecution history, if it is in evidence.  The court noted that "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the

meaning of the term in the abstract" and asserted that district courts should give substantially less credence to such extrinsic sources. *Phillips*, 415 F.3d at 1321.

The baseline determination in a claim construction analysis, then, is the claim's ordinary and customary meaning, as understood by persons skilled in the art at the time the patent was filed. The Federal Circuit has made it clear that the specification is "dispositive" and the "single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (*quoting Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 152 (Fed. Cir. 1996)). In recent years, the Supreme Court has also asserted that the specification is of "'primary importance in ascertaining what it is that is patented.'" *Phillips*, 415 F.3d at 1312. *(quoting Merrill v. Yeomans*, 94 U.S. 568 (1876)). In most instances, "the ordinary meaning of claim language as understood by a person of skill in the art" is "readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. When a claim term cannot be easily discerned, the court should turn to "the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

The court must presume that the terms in the claim mean what they say. *Comark Communications, Inc. v. Harris* Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998); *See*

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

The entire claim must be interpreted in context, not as single elements in isolation.  The

words used in the claims are interpreted in light of the intrinsic record evidence, including

the written description, drawings, and the prosecution history.  *Teleflex, Inc. v. Ficosa*

*North America Grp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).   Unless otherwise compelled,

the court must give full effect to the ordinary and accustomed meaning of claim terms.

*Johnson Worldwide Assocs., Inc., v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).  A

patentee may be his or her own lexicographer and use terms in a manner different from

their ordinary meaning, and in those cases where the special definition differs from the

meaning it would otherwise possess, the patentee's lexicography governs.  *Phillips*, 415

F.3d at 1316; *see also Abbott Labs v. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir.

2003)(allowing the entry of a definition of a claim term other than its ordinary and

customary meaning where the patentee "has chosen to be his or her own lexicographer by

clearly setting forth an explicit definition for a claim term").

        The court cannot read into a claim a limitation that appears in the specification but

not in the claim itself.  *Phillips,* 415 F.3d at 1323.  "[T]he general principle is that

limitations from the specification are not to be read into the claims."  Sjolund v. Musland,

847 F.2d 1573, 1582 (Fed. Cir. 1988).  Particularly, the court should not limit the

invention to the specific examples or preferred embodiment found in the specification.

*Phillips,* 415 F.3d at 1323.  The "repetition in the written description of a preferred aspect

of a claim invention does not limit the scope of an invention that is described in the claims in different and broader terms." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998). *See also Phillips*, 415 F.3d at 1323 (describing how to distinguish between a best mode disclosure and a limitation disclosure in a specification).

Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question. *See SciMed Life Systems v. Advanced Cardiovascular*, 242 F.3d 1337 (Fed. Cir. 2001). The court cannot interpret the meaning of a word found in a claim by adding an extraneous limitation found in the specification. *Id*. There is a fine line between reading a claim in light of the specification and reading a limitation from the specification. The court must cautiously look to the specifications for assistance in defining unclear terms instead of assistance in limiting terms. *Comark*, 156 F.3d at 1186-87.

The court must also consider the patent's prosecution history, if it is in evidence. 415 F.3d at 1317. As intrinsic evidence, the prosecution history provides the court with valuable evidence of how the inventor and the Patent and Trademark Office understood the claims. The prosecution history contains the complete record of the proceedings before the Patent and Trademark Office's issuance of the patent, along with the patentee's express representations concerning the scope of the patent, interpretations of claims terms

11

that were disclaimed during the prosecution, and the prior art cited during examination of the patent. *Phillips,* 415 F.3d at 1317; *see also Vitronics*, 90 F.3d at 1582-83; *Ecolab*, 264 F.3d at 1368.  However, the prosecution history "cannot enlarge, diminish, or vary the limitations in the claim." *Markman*, 52 F.3d at 979.

While intrinsic evidence is the primary evidence considered by a court in claim construction, extrinsic may be consulted, as a last resource, to discern ambiguity in claim language. *Phillips,* 415 F.3d at 1317. Courts may consult dictionaries or comparable sources to assist in understanding the meaning of words and gain a better understanding of the disputed technology. *Phillips*, 415 F.3d at 1322.  However, the intrinsic evidence must take precedence when there is a conflicting definition. *Id.*   If, after consulting extrinsic evidence, the claim is susceptible to "both a broader and narrower meaning, the narrower meaning should be chosen if it is the only one clearly supported by the intrinsic evidence." *Phillips*, 415 F.3d at 1317-19 (discussing the proper use of extrinsic evidence).

Inventor and other expert testimony may be considered useful in providing background information on the asserted technology and to clarify what a person skilled in the art would understand a particular term to mean.  However, less weight should be given to testimony that consists of conclusory statements or that is offered in a form not subject to cross-examination. *Phillips*, 415 F.3d at 1318.  Finally, expert testimony that is clearly at odds with the intrinsic record must be discounted. *Id.; See also Key Pharms. v.*

*Hercon Lab. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998), *reh'g denied* (courts may receive extrinsic evidence to educate themselves about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence).

Finally, the *Phillips* court stated that validity, at best, should be a very small consideration in claim construction.  The court stated, "[w]hile we have acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, and have certainly not endorsed a regime in which validity analysis is a regular component of claim construction."  415 F.3d at 1327.  As such, validity should only be considered when "after applying all the available tools of claim construction . . . the claim is still ambiguous."  415 F.3d at 1327 (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004)).

Applying the above standards, this Court will now undertake a proper claim construction.

## IV.  ANALYSIS

### A.  The '313 patent

The '313 patent is comprised of seventeen (17) claims.  Claim 1 is an independent claim, and claims 2-17 are dependent claims which add further limitations on claim 1.  It does not appear that there is any dispute as to the meanings of the limitations in claims 2,

4, 6, 9, 10, 11, 12, 13, 14, 15 and 16.  As such, this Court declines to construe the terms contained in those claims.

## 1.  Claim 1

Claim 1, which has been reformatted for clarity, claims:

A *modular prosthesis system* comprising

a prosthetic base portion having a surface for positioning adjacent to a corresponding bone, the base portion having a base mounting means thereon, and

a *stem extension* for insertion into a cavity in a bone,

the stem extension having a stem mounting means for mounting the stem extension to the base mounting means, and

the stem extension further having an elongated stem portion connected to the *stem mounting means* by a connection portion, and

wherein the stem mounting means has a first central longitudinal axis and the elongated stem portion has a second central longitudinal axis substantially parallel to the first axis, but which is spaced apart therefrom to provide an offset therebetween.

'313 patent, col. 5, ll. 17-30 (emphasis added).

## a.  Federal Circuit's Construction of Certain Terms in Claim 1

The Federal Circuit clearly held that there is no radial adjustment requirement in claim 1.  Fed. Cir. Op. at 10.  The Federal Circuit also construed the terms "modular

14

prosthesis system," "stem extension," and "stem mounting means.  For the sake of clarity, those constructions are reviewed and reiterated below.

**"Modular Prosthesis System"**

On appeal, Zimmer argued that the term "modular" in claim 1 means "one piece," requiring that the stem extension be a single piece.  The Federal Circuit rejected this argument, reversing this Court's construction and finding instead that there is no basis in the claim language, specification, or prosecution history for this construction.  Rather, the Federal Circuit found that the parties agree, and the district court correctly found, *Zimmer,* 258 F.Supp.2d at 877 n.2, "that the term 'modular' means 'standardized.'"  Fed. Cir. Op. at 8.  The Federal Circuit further construed the term "modular" as "not limited to one-piece units" and as only modifying the term "prosthesis system" in the claims.  The Court reasoned that if "'modular' meant 'one piece,' claim 1 would exclude the prosthesis system of the preferred embodiments disclosed in the specification because the prosthesis systems show in the figures include two pieces–the stem extension and the base portion." *Id*.  The Court also reviewed the '313 patent's prosecution history and asserted that there is no indication in that history that the term "modular" means "one piece."[1]  As such, the

_____

[1]Additionally, the Federal Circuit made it clear that the "mere fact that the stem mounting means and the elongated stem portion may have been two separate pieces before they were attached to form the stem extension does not take the stem extension outside the scope of claim 1." Fed. Cir. Op. at 9.  Further, the Federal Circuit stated that the distinction between the '313 patent and Lazzeri is the offset between the axes, not whether the stem extension includes one or more pieces. *Id.*

Federal Circuit held that the term "modular prosthesis system" in the preamble to claim 1 means a standardized prosthesis system which does not require a one-piece stem extension.  This construction is now part of the law of the case.

**"Stem Extension"**

The Federal Circuit construed the term "stem extension" in claim 1 to encompass both one-piece and multiple-piece stem extensions.  Fed. Cir. Op. at 10.  This is now part of the law of the case.

**"Stem mounting means"**

In construing this term, the Federal Circuit stated, "[t]he parties agree that the "stem mounting means" limitation is a means plus function limitation such that the limitation covers the embodiments disclosed in the specification that perform this function and their equivalents."  Fed. Cir. Op. at 11.  The structural feature disclosed in the '313 patent specification that performs this function is the Morse taper.  The Federal Circuit stated that a screw connection, like the one employed in the accused devices, "is not disclosed in the specification as performing this function.  Instead, the only disclosure of a screw in the '313 patent is not to replace the Morse taper, but to augment it."  *Id*. According to the specification, "additional securing features could be utilized to further secure this tapered connection, such as a screw . . . which could connect through the base portion 10 into the pin 33 of the stem extension 1."  '313 patent col. 3, ll. 52-56 (see also Fed. Cir. Op. at 11).

16

The Federal Circuit went on to discuss the issue of whether the screw connection of the accused products is equivalent to the Morse taper (in the '313 patent) for the purposes of section 112, paragraph 6.  The Federal Circuit concluded that there was "sufficient evidence to raise a genuine issue of material fact as to whether the Morse taper and threaded connections are equivalent structures for the purpose of literal infringement of claim 1 under section 112, paragraph 6."  Fed. Cir. Op. at 13.

**b.  Additional Claim Construction of Claim 1 Terms**:

This Court now turns to the construction of terms in claim 1 which are still in dispute.

**"A modular prosthesis system comprising a prosthetic base portion...and a stem extension..."**

Zimmer asserts that the Federal Circuit only partially construed the term "stem extension" when it held that it encompasses both one-piece and multiple-piece stem extensions.  Zimmer argues that the Federal Circuit did not construe the terms of this limitation which refer to the <u>parts</u> that make up the claimed "stem extension."  Zimmer's proposed construction of this claim term is: "*a standardized prosthesis system including a prosthetic base portion...and a stem extension, that are located <u>on the same side of a joint</u>*" (emphasis added).  Zimmer asserts that one of ordinary skill in the art would understand that the base portion and stem extension must be located on the same side of a joint.  Zimmer states that this construction is compelled by the claim language itself,

17

which requires that the stem extension be mounted to the base portion.  04/06/05 Zimmer

Mem. at 123.  Zimmer reasons that the meaning of the term "base," the claim language

(base portion and stem extension are mounted together), and the specification compel this

construction.  Finally, Zimmer asserts that the term "base portion" is readily

understandable according to its ordinary meaning as being a "supporting part of layer."

*Id*. at 123 (quoting Webster's New Universal Unabridged Dictionary (1992)).

 Howmedica asserts that Zimmer's construction is incorrect because it adds an

unstated limitation.  Howmedica stated, "Zimmer cannot avoid the Federal Circuit's claim

construction by throwing in the terms 'base portion' and 'stem extension' and calling it a

'new' claim term requiring an entirely new construction."  05/06/05 Howmedica Mem. at

7.  Howmedica states that the plain language of claim 1 does not require that the base

portion and stem extension be located on the same side of the joint, but rather broadly

recites a "modular prosthesis system."  05/06/05 Howmedica Mem at 8.  Further,

Howmedica states that Zimmer admitted that "'the '313 patent does not claim a joint, and

the term "joint" does not appear anywhere in the patent.'" *Id.* at 9 (quoting Zimmer's

Statement of Undisputed Facts at ¶ 7).  Rather, Howmedica argues that claim 1 only

requires "a modular prosthesis system," "a prosthetic base portion," and "a stem

extension."  As such, Howmedica asserts that the proper construction of this term is a

"*prosthesis system of standardized units*" with no requirement that the base portion and

stem extension be located on the same side of the joint.  Transcript of Oral Proceedings

Held on 06/09/05 at 3.

In construing this claim term, this Court looked first to the specification of which it is a part.  One "purpose for examining the specification is to determine if the patentee has limited the scope of the claims."  *Watts. v. XL Sys., Inc*., 2323 F.3d 877, 882 (Fed. Cir. 2000).  The specification reveals that claim 1 contemplates the connection between the base portion and stem extension to be one that is both "releasably fixed" and as one providing "a secure mating interlock."  '313 patent, col. 5, ll. 36-36; col. 6, ll. 5-7.  This connection is described in the specification as occurring at the undersurface of the base portion, whereas the other surface of the base portion is attached to an "articular surface or additional portion.  '313 patent, col. 2, ll. 57-59.  Additionally, the adjacent surfaces of the base portion and stem extension are in a bone cavity.  '313 patent, col. 4, ll. 7-21.  If the base portion and stem extension could be located on opposite sides of a joint, then the space between the two would be the joint space–where articulation occurs–rather than in a bone cavity.  This would be in direct contravention of the specification.  Finally, a study of the figures in the specification and in the descriptions of the embodiments in the specification show that the base portion and stem extension cannot, then, be on opposite sides of the joint, because this type of prosthetic joint requires movement between the components on either side.  See Crowninshield Decl. ¶ 27.  As such, this Court adopt's Zimmer's proposed construction and construes this term as requiring "a standardized prosthesis system including a prosthetic base portion...and a stem extension, that are

located on the same side of a joint."

**"Mounting"**

When construing the term "stem mounting means for mounting the stem extension to the base mounting means," the Federal Circuit asserted that the claimed function is "mounting" and held that the disclosed structure for performing this function is a Morse taper. The Federal Circuit then cited two examples from the specification. First, the Federal Circuit referenced Figure 2 of the '313 patent, which depicts a Morse taper with the mating pin on the stem extension and the recess on the base portion. Next, it pointed to Figure 8, which shows the recess on the stem extension which mates with a corresponding pin on the base portion. Based on these assertions, Zimmer argues that this claim limitation requires either the pin or recess of a Morse taper or equivalent structures. Zimmer further asserts that in holding that the claimed function is "mounting," the Federal Circuit failed to construe the term "mounting."

Zimmer asserts that "mounting" should be construed according to its ordinary meaning. Zimmer alleges that "to mount" means "to fix on or in a support, backing, setting, etc. . . . mounting means 'fixing' which means to make fast." 04/06/05 Zimmer Mem. at 14 . Zimmer states that this construction is consistent with the way those skilled in the art use the word "mount." As such, Zimmer believes that "mounting" in this claim should be construed as "a *Morse taper or equivalents thereof for fastening the stem extension to the base portion, such that the stem extension and base portion are not free*

20

*to move relative to one another*."  (emphasis added).  04/26/05 Zimmer Mem. at 13;

05/24/05 Zimmer Mem. at 5.  Zimmer alleges that, in orthopaedic art, a Morse taper is a

tapered post or pin that is configured to connect with a tapered recess to form a secure

mating interlock.  Crowninshield Decl. ¶ 50; ex. 4, U.S. Patent '609, col. 1 ll. 28-29; Ex.

G to Vogler Decl. '835 patent, col. 2 ll. 24-28.   Zimmer asserts that the goal of the

invention is to substitute for rigid bone.  Finally, Zimmer asserts that "mounting" means

"fixing," which means "to make fast."  04/06/05 Zimmer Mem. at p. 14 (quoting

Webster's New Universal Unabridged Dictionary (1992) at 537 ("to make fast, firm, or

stable"); 688 ("to place securely; make stable or firm").

Howmedica opposes the inclusion of an additional function beyond merely

"mounting," i.e. "fixing or fastening . . . such that the stem extension and base portion are

not free to move relative to one another."  Rather, Howmedica proposes that this term

should be construed as "*a Morse taper or equivalent structures capable of performing the*

*claimed function of mounting the stem extension to the base*."  Transcript of Oral

Proceedings Held on 06/09/05 at 5.  In its argument, Howmedica also refers to mounting

as mating.  Howmedica asserts that claim 1 does not recite this additional "fixing without

relative movement" function.  Further, Howmedica argues that the Federal Circuit

instructed that section 112, paragraph 6 equivalents "must merely perform that claimed

function" and that "[c]laim 1 does not include a radial adjustability' or a 'releasability

during surgery requirement.'" Fed. Cir. Op. at 12.

Howmedica asserts that a broad construction of "mounting" is consistent with the intrinsic record. The specification states that the "stem mounting portion 2 is radially adjustable in cooperation with the base mounting portion 12." '313 patent, col. 3 ll. 15-16. Howmedica asserts that Zimmer's narrow construction, requiring "fixing without relative movement," would necessarily exclude this preferred embodiment. 05/06/05 Howmedica Mem. at 11. Howmedica also disputes Zimmer's assertion that the "fixing without relative movement" limitation would serve to meet the goal of the invention by stating, "the specification only discusses certain embodiments that may have a fixed arrangement." *Id.*

Finally, Howmedica asserts that functions other than the claimed function, such as fixing without relative movement, are irrelevant and goes on to state that Zimmer's definition of "mounting" is not supported by its own dictionaries. *Id.* at 10. Rather, Howmedica states "[w]hile 'mounting' may also include fixing or fastening, it is not limited to this. The meaning of 'mounting' is broader." *Id.* To this end, Howmedica cited definition 10a for mounting in the American Heritage Dictionary,[2] which states "to set in position for use: mount guns." *Id.* Howmedica reasons that this definition is applicable and useful here and further analogized that a "mounted gun is not necessarily fixed or fastened to prevent movement." *Id*.

_____

[2]This definition was also included in the list cited by Zimmer in Exhibit 2 on page 1180, which was attached to Zimmer's 4/6/05 Opposition Brief.

This Court's construction of "mounting" does not contradict the Federal Circuit's construction of the same term. Rather, the Federal Circuit held that the claimed function in "stem mounting means for mounting the stem extension to the base mounting means" is mounting, but did not construe what the term "mounting" actually means. Therefore, this Court undertakes to construe that particular term.

Again, this Court begins its consideration of this term by looking to the claim language itself and to the specification. The specification states that "after selecting the desired position for "axis B" relative to the base portion . . . the stem extension can be releasably fixed to the base portion in the selected orientation. '313 patent, col. 3. ll. 25-29. Further, the specification describes the Morse taper as providing a "secure mating interlock" between its recess and pin and notes that additional features may be used to "further secure" the tapered connection. '313 patent, col. 3 ll. 48-50. Each embodiment in the specification discloses the base mounting means being fastened to the stem mounting means, but the specification never asserts that there is no movement between them. There is nothing, then, in the written description or specification to suggest that the base portion and stem extension would not or could not have freedom of movement once mounted. *See Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998). Rather, the specification merely discusses fixing the pin and recess together by way of a tapered or conical pin and mating recess. '313 patent, col. 3, ll. 48-50.

The specification states that the invention is "particularly suitable for modular

23

tibial prosthesis components having modular stem extensions." '313 patent, col. 1, ll. 9-11. However, the features of this invention "could be adapted as appropriate, to other prosthetic components." '313 patent, col. 1, ll. 11-12; *See also* '313 patent, col. 2, ll. 5-7 ("it is particularly suitable for use with modular tibial prosthesis components, although it is not limited thereto"). This court may not limit the invention to the specific examples or preferred embodiment found in the specification. *Phillips,* 415 F.3d at 1323. Therefore, while the components may not actually move relative to each other when mounting tibial components, the same may not be true with other components, such as a wrist. It is not clear from the specification and prosecution history that this mounting must be accomplished without movement; in other words, a variation in the joint type (e.g. one allowing movement) might also be securely fixed in terms of mounting while still allowing for movement between the two. As such, it would be improper to limit this claim term in this manner.

A broad construction of "mounting" is consistent with the intrinsic record in this case. The specification states, "the stem mounting portion is radially adjustable in cooperation with the base mounting portion." '313 patent, col. 3, ll. 15-16. Restricting this claim in the manner requested by Zimmer would not only unnecessarily narrow this claim but also would exclude the preferred embodiment. This the Court will not do. *Eolas Technologies, Inc., v. Microsoft Corp.,* 399 F.3d 1325, 1337 (Fed. Cir. 2005)(*citing Telecom Ltd. v. Samsung Elecs.,* 215 F.3d 1281, 1293 (Fed. Cir. 2000). "[I]t is

elementary that a claim construction that excludes the preferred embodiment 'is rarely, if ever correct and would require highly persuasive evidentiary support.'" *Neomagic Corp. v. Trident Microsystems, Inc.,* 287 F.3d 1062, 1074 (Fed. Cir. 2002)(*quoting Vitronics*, 90 F.3d at 1583 (Fed. Cir. 1996). Finally, Howmedica's construction of the term "mounting" is correct because it is consistent with the claim language and the specification. Zimmer's construction, on the other hand, is inconsistent with the claim language. If, after consulting extrinsic evidence, the claim is susceptible to a broader and narrower meaning, the narrower meaning is chosen if it is the <u>only</u> one clearly supported by the intrinsic evidence. *Phillips*, 415 F.3d at 1317-19 (discussing the proper use of extrinsic evidence). While Zimmer is correct that mounting is defined as "to make fast, firm, or stable"[3] and "to place securely; make stable or firm,"[4] it also means "to set in position for use."[5] Thus, Zimmer's more narrow construction is not the only definition clearly supported by the intrinsic evidence. This Court declines to narrow the construction of this claim. Rather, it opts to construe the term in such a manner as to encompass all consistent meanings. *See Rexnord Corp. v. Laitram Corp*., 274 F.3d 1336, 1343 (Fed. Cir. 2001). Therefore, this Court adopts Howmedica's proposed construction of this claim and construes this claim as: *"a Morse taper or equivalent structures capable*

---

[3]Webster's New Universal Unabridged Dictionary (1992) at 537.

[4]Webster's New Universal Unabridged Dictionary (1992) at 688.

[5]American Heritage Dictionary, definition 10a for mounting

of performing the claimed function of mounting the stem extension to the base."

## 2.  Claim 3

Claim 3 is dependent upon claim 2 and claims:

"[T]he system of claim 2 wherein the stem extension is releasably fixed to
the base portion in the selected orientation." '313 patent, col. 5, ll. 36-38
(emphasis added).

On appeal, Zimmer argued that the connection be releasable during surgery, and
the Federal Circuit agreed.  The Federal Circuit consulted the specification, which states
that when mounting the base portion to the stem extension, "[t]he surgeon would select
the desired position for axis 'B' relative to the base portion 10, and then the stem
extension 1 can be releasably fixed to the base portion 10 in the selected orientation."
'313 patent, col. 3, ll. 25-29.   The Federal Circuit the construed the term "releasably
fixed to the base portion" as requiring that the connection between the base portion and
stem extension "be releasable after the surgeon has selected the desired position for the
stem extension axis, which occurs during surgery."  Fed. Cir. Op. at 13-14.  This
construction is now a part of the law of the case.

On remand, Zimmer argues that this construction addresses the time frame in
which the stem extension is releasable (i.e. during surgery), but does not address the term
"fixed."  Zimmer proposes that the term "fixed" should be construed as "*after the desired
portion of the stem extension has been selected and the stem extension has been made fast*

26

*to the base portion, the stem extension is releasable during surgery*."  Zimmer asserts that the ordinary meaning of "fixed" means "to be made fast so as not to allow movement. Zimmer states that Claim 3 requires that the two components be capable of being released, but that they are not free to move in relation to one another <u>unless </u>they are released.

In contrast, Howmedica states that Zimmer's construction of "releasably fixed" as "made fast so as not to allow movement" is unsupported by the claim language.  Docket 05/06/05 Howmedica Mem. at 16.  Rather, Howmedica asserts that there is nothing in claim 3 to support the contention that the base portion and stem extension cannot rotate or move relative to each other.  Instead, Howmedica argues that this claim term should be construed as requiring the stem extension to be "*releasably fixed to the base portion in the selected orientation*."  *Id.*

This Court holds that the Federal Circuit construed this term to the extent necessary when it held that the connection between the stem extension and the base portion "must be releasable after the surgeon has selected the desired position for the stem axis, which occurs during surgery."   Fed. Cir. Op. at 13-14.  Additionally, as discussed above with respect to claim 1, this Court is not of the view that mounting requires fixing or fastening without movement relative to each other.  A claim term "should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent."  *Rexnord*, 274 F.3d at 1342 (*See Phonometrics, Inc. v. Northern Telecom*

27

*Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998)("a word or phrase used consistently throughout a claim should be interpreted consistently")).  In this context, mounting or fixing has been previously construed in claim 1 as putting in position for use.  To effectuate consistency between terms and for the same reasons employed in the analysis above, this Court adopts Homedica's proposed construction of this claim, which states: "releasably fixed to the base portion in the selected orientation."

**3. Claim 8**

Claim 8 is dependent upon claim 1 and claims: "[T]he system of claim 1 wherein the base mounting means includes a recess therein, and wherein the stem mounting means includes an extending pin for mating with the recess."  '313 patent, col. 6, ll. 1-4.

**"Extending pin" and "recess"**

Zimmer asserts that "extending pin" should be construed as "the male component of a Morse taper."  To support this reasoning, Zimmer points to the specification, which states that the mounting structure, itself, is a Morse taper.  As such, Zimmer asserts that the proper construction of "extending pin" is the pin, or the male component, of a Morse taper connection.  04/06/05 Zimmer Mem. at 16.  After consulting the specification, and in coordination with the construction of "extending pin," Zimmer asserts that the proper construction of "recess" is as the "female component of a Morse taper."  *Id*.  Howmedica only responds to these arguments by way of presenting anticipation arguments.

In construing the stem mounting means of claim 1, the Federal Circuit stated that

28

the disclosed structure for performing the mounting function is the Morse taper. The

specification states that a Morse taper includes an extending pin and a recess. '313

patent, col. 3, ll. 45-50. The base mounting means must include a recess therein, and the

stem mounting means must include an extending pin for mating with the recess. '313

patent, col. 3, ll. 45-48. Moreover, this Court finds that Zimmer's construction is

supported by the intrinsic evidence and more clearly defines the terms' boundaries than if

they were left otherwise undefined. *Stmicroelectronics, Inc. v. Motorola, Inc.*, 327

F.Supp.2d 687, 697 (E.D. Tex. 2004). Accordingly, this Court adopts Zimmer's

construction of "extending pin" as the "male component of a Morse taper" and "recess"

as the "female component of a Morse taper.*"*

**4. Claim 17**:

Claim 17 is dependent upon claim 1 and claims:

The system of claim 1 wherein the stem mounting means is selectively
positionable in a plurality of orientations with respect to the base mounting
means so that the second axis can be selectively oriented in a plurality of
positions with respect to the first axis and with respect to the base portion.

'313 patent, col. 6, ll. 43-48.

Zimmer asserts that this term, "selectively positionable" should be construed as

"*capable of being oriented and made fast in more than one location with respect to the*

*base mounting means, where the location is chosen prior to the stem extension's insertion*

*into the bone*." Zimmer asserts that the term "mounting" in claim 17 requires that the

stem extension and base portion be fastened or attached together such that they are not free to move relative to one another.  04/06/05 Zimmer Mem. at 17.  Zimmer points to the specification and abstract, which state: "The stem extension can be attached in a selected orientation with respect to the base portion, thus enabling the main body of the stem to be positioned in any one of a plurality of orientations with respect to the base portion."  '313 patent, Abstract.  The specification goes on to state that the conical shape of the Morse taper "enables the stem extension 1 to be attached in any selected radial orientations." '313 patent, Abstract, col. 3 ll. 50-52.  And in the prosecution application, the applicant stated, "this feature is different from a system in which only a single orientation is provided."  '313 patent Prosecution History, June 14, 1993, Amendment at 3.  Finally, Zimmer rests its argument on Dr. Crowninshield's declaration, in which he stated, "[i]t is clear that orientation requires that the stem mounting means be positioned or placed in a location with respect to the base mounting means, and that it then remains there." Crowninshield Decl. ¶ 88.

In contrast, Howmedica asserts that claim 17 does not require that the stem be oriented and subsequently fixed without movement, but only that the stem mounting means be positionable.  05/06/05 Howmedica Mem. at 21.  Howmedica then construes each term, "selectively" and "positionable," separately.  Howmedica proposes that "selectively" should be construed as "the orientation of the components is selected prior to the components being secured in the bone."  Howmedica argues that the ordinary

meaning of the term "positionable" should be adopted as consistent with the embodiments described in the '313 patent.  *Id.*  As such, Howmedica alleges that "positionable" should be construed as "capable of orienting the stem in a plurality of radial orientations."  Thus, according to Howmedica, "selectively positionable" requires only *"that the stem be capable of being positioned or arranged in any desired orientation*."  *Id.* at 22.

Howmedica's construction of this claim term is correct and, as such, adopted by this Court. As discussed in relation to claims 1 and 3, this Court is not of the view that mounting requires fixing or fastening without movement relative to each other.  Rather, in this context, selectively positionable refers to being put in position for use.  Here, we are dealing with a component that must be positioned or arranged in any variety of orientations prior to insertion into the bone.  Thus, for the same reasons employed in the analysis above, this Court adopts Homedica's proposed construction of "selectively positionable, which requires "that the stem be capable of being positioned or arranged in any desired orientation."

## B.  Summary Judgment Motions

It is necessary at this time to discuss the pending motions for summary judgment, which include Howmedica's Renewed Motion for Summary Judgment of Invalidity of Claims 1-4, 6, 8, and 13-17 and Noninfringement of Claims 5, 7, and 9-12 of the '313 patent and Zimmer's Motion for Partial Summary Judgment on Howmedica's Defense and Counterclaim that the Greenwald Patent Anticipates or Renders Obvious the Asserted

Claims of the '313 patent.  In its brief, Howmedica asserted that the Federal Circuit had, in fact, completed a full claim construction by construing three main claim terms.  As such, Howmedica relied solely on those claim constructions in briefing its summary judgment motion and in responding to Zimmer's motions.  The reverse applies to Zimmer.

The summary judgment standard in patent cases when determining infringement is a two-step process.  First the court determines the scope and meaning of the asserted claim.  Then, the court compares the properly construed claims with the accused device or product to reach a finding regarding infringement.  *Johnson Worldwide*, 175 F.3d at 988. In the context of summary judgment, this Court reviews the second determination for genuine disputes of material facts that would preclude a grant of summary judgment. *Hilgraeve Corp. v. McAfee Assocs.*, 224 F.3d 1349, 1352-54 (Fed. Cir. 2000).

At the time of the briefing of the motion for summary judgment, Howmedica was relying on a partial claim construction.   In order to properly adjudicate summary judgment in this matter, and in light of the present *Markman* determination, the appropriate remedy is to deny the current motions for summary judgment and permit the filing of new summary judgment motions.

## IV.  CONCLUSION

The present motions for summary judgment were based upon an undefined claim construction, and the parties used conflicting constructions in their respective briefs.

Therefore, Howmedica's Renewed Motion for Summary Judgment of Invalidity of Claims 1-4, 6, 8, and 13-17 and Noninfringement of Claims 5, 7, and 9-12 of the '313 patent is **DENIED**, and Zimmer's Motion for Partial Summary Judgment on Howmedica's Defense and Counterclaim that the Greenwald Patent Anticipates or Renders Obvious the Asserted Claims of the '313 patent is also **DENIED**.  At this time and in light of this complete, defined claim construction, the parties should present any summary judgment issues in accordance with this order.  The parties need not and should not revisit the issue of claim construction, as this Court will not revisit it.  The only issues remaining are those concerning summary judgment.  Motions for summary judgment must be filed with this Court no later than Tuesday, January 3, 2006.

**IT IS SO ORDERED.**

**DATE: October 12, 2005**


_____  **S/ ALLEN SHARP**_____

_____**ALLEN SHARP, JUDGE**

**UNITED STATES DISTRICT COURT**