UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| ZIMMER TECHNOLOGY, INC, and | ) | |
| ZIMMER, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  3:02cv425 |
| | ) | |
| HOWMEDICA OSTEONICS CORP. | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court on a "Motion to Strike the Deposition Errata Sheet of
Zimmer's Rule 30(b)(6) Witness, Kevin Greig", filed by the defendant, Howmedica Osteonics
Corp. ("Howmedica"), on February 13, 2009.  The plaintiffs, Zimmer Technology, Inc. and
Zimmer, Inc. ("Zimmer"), filed their response on March 5, 2009, to which Howmedica replied
on March 19, 2009.

For the following reasons, the motion to strike will be denied.

Discussion

Howmedica requests the court to strike the January 22, 2009 errata sheet of Kevin Greig,
Zimmer's Rule 30(b)(6) witness on facts relating to Howmedica's pending Motion For
Sanctions. Howmedica claims that Zimmer has improperly has attempted to "fix" damaging
testimony from Mr. Greig by having him submit an errata sheet that blatantly reverses
his sworn testimony.

Howmedica argues that a deposition is not a "take home examination." Paul Harris
Stores, Inc. v. PricewaterhouseCoopers, LLP, 2006 U.S. Dist. LEXIS 65840 (S.D. Ind. Sept. 14,
2006).  Howmedica strongly contends that Zimmer should not be allowed to go back, after a

deposition, and have its witness change his testimony simply because it is damaging to Zimmer.

The Greig errata sheet arises from Zimmer's response to Howmedica's pending Motion For Sanctions. On October 1, 2008, Howmedica moved the Court for sanctions based on Zimmer's eve-of-trial production of over 3000 pages of Insall-Burstein II ("IB-II") system documents many of which, according to Howmedica, were clearly responsive to years-old Howmedica discovery requests. In opposing Howmedica's Motion, Zimmer relied on a sworn declaration from Mr. Greig, who was the Zimmer engineer in charge of the IB-II system development. (See D. 643 at Ex. 16.) According to Zimmer, Mr. Greig's declaration supported its claim that none of the previously-withheld IB-II documents, including a 1987 IB-II meeting report (ZIM116596-600/ZIM116482-485), is responsive to Howmedica's prior document requests. (See D. 643 at 11-13.) Zimmer argued that (based on Greig's declaration) the 1987 meeting report was not previously produced because it did not "refer or relate to the decision to use a Morse taper" and therefore was non-responsive to Document Request No. 69. At his December 4, 2008 deposition, however, Mr. Greig admitted that his declaration on this issue was in conflict with his deposition testimony:

| Mr. Greig's Declaration | Mr. Greig's Deposition Testimony |
|---|---|
| "The meeting [ZIM116596] <u>does not relate to the decision to use a taper connection</u>…" (Greig Decl. at ¶6) (emphasis added) | "Q. But you would agree that that <u>meeting at least relates to the decision to use a taper connection</u>; correct? A. Yes. I would agree with that." (Greig Dep. at 60-61) (emphasis added). |
| "The meeting [ZIM116596] <u>is not related to consideration of changing from a taper to a screw connection.</u>" (Greig Decl. at ¶6) (emphasis added). | "Q. So the meeting at HSS in April of '87 again <u>related to consideration of changing from a taper to a screw connection</u>; correct? A. I agree." (Ex. C, Greig Dep. at 60-61) (emphasis added). |

When Howmedica's counsel asked Mr. Greig about the contradictions between his deposition testimony and declaration testimony, he admitted they were "in conflict":

> Q. And yet in your declaration you testified under oath that, excuse me, that the meeting does not relate to the decision to use a taper connection. … That was your sworn testimony in your declaration, correct?
> A. I can't – I can't answer why it appears in this document to conflict what I just said.
> Q. But there is a conflict, correct?
> A. I think there is.

(Greig Dep. at 60-61) (emphasis added).) When confronted with this "conflict" at his deposition, Mr. Greig did not change his deposition testimony. Howmedica states that there was no apparent misunderstanding about the "conflict" between Mr. Greig's sworn declaration and deposition testimony. Rather, Mr. Greig stated that Zimmer's attorneys wrote his declaration for him.

> Q. And Zimmer's attorneys wrote this declaration for you; is that correct?
> A. I believe so.

(Greig Dep. at 63).

Mr. Greig subsequently submitted an "errata" sheet that changes several of his deposition answers. These changes include:

| Mr. Greig's Deposition Testimony | Mr. Greig's Errata Sheet |
|---|---|
| "Q. That related to the decision to use a taper; correct? A. <u>Correct</u>." (Greig Dep. at 58:12-14 (emphasis added).) | "Q. That related to the decision to use a taper; correct? A. <u>No, that is not correct. It related to the decision to use a taper with a female thread or male thread.</u>" (Errata Sheet at 1 (emphasis added).) |
| "Q. But you would agree that that meeting at least relates to the decision to use a taper connection; correct? A. <u>Yes. I would agree with that.</u>" (Greig Dep. at 60-61 (emphasis added).) | "Q. But you would agree that that meeting at least relates to the decision to use a taper connection; correct? A. <u>No, it relates to the taper with a female or a male thread</u>." (Errata Sheet at 1 (emphasis added).) |

| | |
|---|---|
| "Q. But there is a conflict, correct? A. I think there is." (Greig Dep. at 61:7-8 (emphasis added).) | "Q. But there is a conflict, correct? A. I do not think there is." (Errata Sheet at 1 (emphasis added).) |
| "Q. So the meeting at HSS in April of '87 again related to consideration of changing from a taper to a screw connection; correct? A. I agree." (Greig Dep. at 60-61 (emphasis added).) | "Q. So the meeting at HSS in April of '87 again related to consideration of changing from a taper to a screw connection; correct? A. No, to a taper and male screw combination connection." (Errata Sheet at 1 (emphasis added).) |
| "Q. Did Zimmer engineers communicate with HSS to your knowledge during the 1970s regarding I/B II design features. A. … I assume that that interaction occurred similar to the way it occurred in the mid '80s…" (Greig Dep. at 26-27 (emphasis added).) | "Q. Did Zimmer engineers communicate with HSS to your knowledge during the 1970s regarding I/B II design features. A. … I assume that they did not interact in the 1970's regarding I/B II." (Errata Sheet at 1 (emphasis added).) |

Howmedica argues that Mr. Greig's errata sheet is not permitted under Seventh Circuit law. In Thorn v. Sundstrand Aerospace Corp., the Seventh Circuit interpreted Fed. R. Civ. P. 30(e), which permits a deponent to "review the [deposition] transcript … and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them." See Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000). The Court in Thorn stated that "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not'." Id. at 389; see also Truly v. Sheahan, 135 Fed. Appx. 869, 871 (7th Cir. Ill. 2005) (quoting and relying on Thorn in holding that errata sheets contradicting deposition testimony were improper). Thorn has been repeatedly cited to preclude parties from attempting to "rewrite" deposition answers. See, e.g., Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP, 2006 U.S. Dist. LEXIS 65840 (S.D. Ind. Sept. 14, 2006) ("The Court rejects the deponent's attempt to rewrite material answers given in his deposition. A

deposition is not a take home examination."); <u>Estate of Moore v. Dixon</u>, 2007 U.S. Dist. LEXIS 91604 (E.D. Wis. Dec. 12, 2007) (striking improper errata sheet reversing testimony); <u>Yow v. Cottrell, Inc.</u>, 2007 U.S. Dist. LEXIS 56240 (S.D. Ill. Aug. 2, 2007)("[f]or the reason that the information offered by the Page errata sheet is clearly contradictory to his deposition testimony sought to be changed, it is inadmissible.")

Howmedica argues that the facts of this case are very similar to those in <u>Estate of Moore</u>. In <u>Estate of Moore</u>, the District Court for the Eastern District of Wisconsin granted a motion to strike an improper errata sheet where:

> The deponent "now wishes to testify 'No' when she previously testified 'Yes,' and she wishes now to state that she is an independent contractor hired by Dixon as opposed to his employee."

<u>Estate of Moore</u>, 2007 U.S. Dist. LEXIS 91604 at *6. The District Court recognized that "[s]uch changes cannot plausibly be represented as a correction of an error in transcription, such as dropping a 'not.'" <u>Id</u>. Nor could the changes be "meant to clarify confusing testimony," because the witness's original testimony was "exceedingly clear." <u>Id</u>. And such changes were not alleged to be based on "new information." <u>Id</u>.

Howmedica contends that Mr. Greig's errata changes directly contradict his deposition testimony and were not allegedly based on "correction of an error in transcription" or "new information." Howmedica points out that the only basis provided in Mr. Greig's errata sheet for completely reversing his substantive testimony is that the testimony was "confusing." Howmedica strongly argues that Mr. Greig's explanation is not credible. Howmedica claims that Mr. Greig's  testimony was not confusing as there was nothing in his testimony to cause confusion. Howmedica expressly raised the conflict between Mr. Greig's declaration and

deposition testimony at the deposition. Mr. Greig apparently understood the conflict, yet declined to change or clarify his testimony at the deposition. Thus, Howmedica concludes that, as in <u>Estate of Moore</u>, Mr. Greig's testimony was "exceedingly clear." Indeed, Howmedica's counsel asked Mr. Greig different variations of a similar question several different times to ensure that there was no confusion:

- "Q. That related to the decision to use a taper; correct? A. Correct."

- "Q. But you would agree that that meeting at least relates to the decision to use a taper connection; correct? A. Yes. I would agree with that."

- "Q. So the meeting at HSS in April of '87 again related to consideration of changing from a taper to a screw connection; correct? A. I agree."

(Greig Dep. at 58, 60-61.) Moreover, the questions posed to Mr. Greig by Howmedica's counsel used the identical language Mr. Greig used in his declaration. (Compare  Greig Decl. at ¶6 ("The meeting does not relate to the decision to use a taper connection…") with Greig Dep. at 60-61 ("Q. But you would agree that that meeting at least relates to the decision to use a taper connection; correct? A. Yes, I would agree with that.").)  Howmedica argues that Zimmer and Mr. Greig cannot credibly claim that the same language Mr. Greig used in his own declaration is suddenly "confusing" when used at his deposition. Howmedica further points out that Mr. Greig was represented by Zimmer's counsel at his deposition, and counsel never objected to any of the allegedly "confusing" questions and answers cited above. (<u>See</u> Greig Dep. at 58, 60- 61.)

In response, Zimmer argues that Federal Rule of Civil Procedure 30(e) states that, after the court reporter notifies the deponent that his deposition transcript is available, the deponent is

allowed 30 days[1] to: "(A) review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e) (emphasis added). The Seventh Circuit and District Courts within this Circuit have held that, as long as the deponent's errata sheet is timely and lists the specific reasons for each change, the deponent can make "any changes in form or substance," including "changes that contradict the original answers, and the reasons given need not be convincing." Telewizja Polska USA, Inc. v. Echo-Star Satellite Corp., 2004 U.S. Dist. LEXIS 20845 at *7-8 (N.D. Ill., October 15, 2004). Furthermore, "courts typically are reluctant to strike these changes" because "it is not for the Court to examine the sufficiency, reasonableness or legitimacy of the reason for the change – that is reserved for the trier of fact." Id. (citing Sanford v. CBS, Inc., 594 F.Supp. 713, 715 (N.D. Ill. 1984) and Lutig v. Thomas, 89 F.R.D. 639, 641, (N.D. Ill. 1981)).

Zimmer states that on December 4, 2008, Howmedica's attorneys deposed Kevin Greig. On December 29, 2008, the court reporter notified Zimmer's counsel that Mr. Greig's deposition transcript was available for review and provided an errata sheet for Mr. Greig to make changes. Within thirty days after this notice, Mr. Greig completed the errata sheet listing seven changes to his deposition testimony and stating the specific reasons for making each change. Six of the seven changes listed on Mr. Greig's errata sheet were made to "clarify confusing testimony" and the other change was made to "correct a factual name." Zimmer claims that Mr. Greig's errata sheet properly states the reasons for each change and that the changes do not contradict his original answer and that, even if they did, Seventh Circuit law allows errata sheet changes that contradict

---

[1] Howmedica has at least implied that the errata sheet was untimely. This court finds the errata sheet to be timely based on the date Greig received a copy of his deposition.

original answers when those changes are necessary to "clarify ambiguous or confusing deposition testimony." Estate of Moore v. Dixon, 2007 U.S. Dist. LEXIS 91604 (E.D. Wis., December 12, 2007).

Zimmer also relies on two pre-Thorn District Court cases. Zimmer claims that the relevant facts in Dunning v. Chemical Waste Management, Inc., 1997 U.S. Dist. LEXIS 5848 (N.D. Ill., April 22, 1997) are similar to the facts here. In Dunning, the Plaintiff (Dunning) was pursuing a breach of contract claim against his former employer, the Defendant, Chemical Waste Management, Inc. ("CWM"). Under the contract, CWM was permitted to fire Dunning if he committed any "illegal, immoral or dishonest acts." During his deposition, CWM's General Manager, John Barone, was asked if he had ever said that Dunning had "done something illegal, immoral, or dishonest." Barone answered, "No." Barone was then asked, "and you don't make that accusation now, do you?" Again, Barone answered, "No." Id. at *7 & *21-22. After reviewing his transcript, Barone completed the errata sheet and changed both answers from "no" to "not other than what I previously testified about," referring to other testimony given during his deposition. The reason for Barone's errata sheet changes was "to clarify [the] answer."

During summary judgment briefing, Dunning argued that the court should strike Barone's errata sheet changes. The District Court denied Dunning's request to strike Barone's errata sheet holding that: "Since Barone provides a reason for each change, the Rule 30(e) requirement has been met, regardless of how convincing the changes seem to be. Therefore, the testimony will not be stricken." The court further explained its ruling as follows:

> Rule 30(e) allows a witness to review the deposition transcript and make "any changes in form or substance" to the answers, provided that the witness gives reasons for the changes. . . . The witness cannot state one conclusory reason for all the changes, but rather must provide a reason for each change made.

8

> However, "[a] witness can make changes that contradict the original answers, and the reasons given need not be convincing." . . . Even in cases where a witness does not specifically follow these rules, courts are hesitant to strike the changes. . . . Instead, courts usually allow changes and stress that these changes can be inquired into on cross examination."

Id. at *21-22 (citations omitted). The Dunning court stressed that "the appropriate remedy is not to strike the changes" because the record will include the original answers, the changed answers, and the reasons for the changes, and the witness will be subject to cross-examination before the trier of fact, which will make appropriate credibility determinations. Id. at *22 n.8

Zimmer further relies on Hawthorne Partners v. AT&T Technologies, Inc., 831 F. Supp. 1398 (N.D. Ill. 1993). In Hawthorne, the deponent, an AT&T employee named Basile, failed to provide reasons for each of his (41) errata sheet changes and he failed to sign his errata sheet within thirty days after receiving notice that his transcript was available. Notwithstanding Basile's failure to comply with Rule 30(e), the court denied Hawthorne Partners' motion to strike Basile's errata sheet stating that: "[T]he appropriate remedy . . . is not to strike the changes. . . . [T]he original answers remain and the changes and reasons have been added, and Hawthorne Partners is free to question Basile on the changes on cross-examination." Id. at 1407.

In response to Howmedica's reliance on Thorn, Zimmer notes that in Thorn, the court held that a deponent may properly make errata sheet changes that "change his deposition testimony from what he said to what he meant." 207 F.3d at 389. Zimmer further notes that in Estate of Moore v. Dixon, also relied upon by Howmedica, the court held that Thorn's rule against errata sheet changes that contradict original deposition testimony "is not without exceptions." Specifically, the court held that: "The law allows consideration of an errata sheet . . . when [it] contradicts prior deposition testimony to 'clarify ambiguous or confusing deposition testimony.'"

(2007 U.S. Dist. LEXIS 91604 at *6).

Zimmer points out that Mr. Greig explained his changes in his errata sheet, stating that six of the changes were "to clarify confusing testimony", and the seventh change was "for further clarity".  Mr. Greig then referred to his original testimony on the same topic given earlier in this same deposition.

For instance, according to Zimmer, Mr. Greig's errata sheet changes involve a portion of his testimony about a "trip report" memorializing some of the details of a meeting, which took place more than twenty years ago in 1987, between Zimmer engineers and engineers from the Hospital for Special Surgery. Mr. Greig was not the author of the 1987 trip report and did not participate in the 1987 meeting. The relevant passage from the trip report reads as follows:

> Dr. Burstein consented to the 6/3/87 target date for design refinements
> including redesign of the locking clip and tray (as described below) but
> that the Zimmer-proposed threaded extension rod design would not be
> included in the design finalized by 6/3/87. He and Dr. Insall insisted on
> lab testing before they would approve it for use in the I/B II system. Such
> an extended evaluation period would negate a June 1988 system release.
> Those in attendance, therefore, consented to pursuing only the taper/captive screw
> tray design of HSS.

The first time that Mr. Greig was asked about this passage during his deposition, he explained that the facts were confusing and needed clarity: "Okay, this is where I think we need a little clarity, and the reason being that the HSS design had a female thread, so you had a male taper and a female thread that would accept a captive screw. What I think this proposal from Zimmer was a male taper with a male screw on the top so that we could eliminate the added piece of a captive screw. We were trying to eliminate that. That was my memory that I was referring to in this." (Greig 2008 Dep. at 49).

Zimmer claims that Mr. Greig was explaining that, at the time of the 1987 meeting, Dr. Insall and Dr. Burstein had already decided to use a Morse taper connection for the tibial stem extensions included in the IB-II knee system. Dr. Insall and Dr. Burstein had also designed a method of augmenting the tapered connection by including a "female threaded" hole in the top of the taper, which would accept a "captive screw" that passed through a female-threaded hole in the tibial tray and seated in the female-threaded hole in the top of the taper. This was the "belt and suspenders" that HSS (Dr. Insall and Dr. Burstein) designed to provide extra security for Dr. Burstein's tapered connection mechanism. And, according to Mr. Greig's 2008 deposition testimony, the topic of discussion during the 1987 meeting was not about abandoning Dr. Burstein's tapered connection for a threaded connection mechanism, but, instead, was focused on Zimmer's proposal for an alternative method of augmenting Dr. Burstein's tapered connection. According to Mr. Greig, Zimmer's proposal would eliminate the captive screw augmenting method that Dr. Burstein designed, which had female threads in the top of the taper connection, and replace it by adding male threads to the top portion of the tapered connection. Zimmer states that this is what Mr. Greig meant when he referred to "a male taper with a male screw on the top." Both the HSS design and the Zimmer proposal included Dr. Burstein's tapered connection mechanism.

Zimmer argues that this portion of Mr. Greig's deposition testimony is entirely consistent with the only other direct evidence describing Zimmer's proposal during the 1987 meeting: Mr. Greig's October 2008 Declaration, and the deposition testimony of Jerry Aikins, a retired Zimmer engineer, who wrote the 1987 trip report and attended the 1987 meeting.

In his Declaration, dated October 6, 2008, Mr. Greig testified consistently with his 2008

deposition testimony quoted above. Mr. Greig said: "At that meeting, Zimmer proposed to Dr. Burstein and Dr. Insall a screw at the end of the taper to augment the taper connection. The function would have been the same as the belt-and-suspenders augmentation screw in the current NexGen system. The meeting does not relate to the decision to use a taper connection, and it is not related to consideration of changing from a taper to a screw connection." (Greig Declaration at ¶ 6).

Likewise, notes Zimmer, on December 10, 2008, Howmedica deposed Jerry Aikins, who authored the 1987 trip report and was present during the 1987 meeting. Howmedica's counsel asked Mr. Aikins about the discussion described in the excerpt from the trip report quoted above. Zimmer claims that Mr. Aikins' testimony was consistent with Mr. Greig's initial testimony about this meeting and demonstrates that the topic discussed was Zimmer's proposal for an alternative method for augmenting the taper connection:

> Q: Okay. So what did the Zimmer-proposed threaded stem extension look like?
>
> A: I only recall one proposed stem extension design that had a screw thread, and it was a coaxial screw thread and Morse taper. So it was a stem extension that had both a screw thread and a taper as we discussed previously. (Aikins Dep. at 51)

Zimmer contends that Howmedica has attempted to capitalize on the lack of clarity in the document by attempting to get Mr. Greig to agree that the document related not to a choice of augmenting methods to use with the tapered connection, but to the underlying decision of whether a tapered connection structure would be used in the first place. Zimmer argues that this created further confusion during Mr. Greig's deposition, and is at odds with additional evidence that also demonstrates unequivocally that Dr. Insall and Dr. Burstein had already selected the tapered connection mechanism years before the meeting in 1987.

During his deposition in 2006, Mr. Greig testified that Dr. Insall and Dr. Burstein, and not Zimmer, made the decision to use a tapered connection for the stem extensions included in the IB-II knee system:

> Q: So, the Insall/Burstein II design was developed by Dr. Insall and Dr. Burstein; correct?
> A: Correct.
>
> <div align="center">* * *</div>
>
> Q: And the decision to use a taper in the stem extension of the Insall/Burstein II design was not a Zimmer design decision but a design decision made by Dr. Insall and Dr. Burstein; is that correct?
> A: They would have made the initial decision to include it in their evolution of their concepts from the Insall/Burstein I to the Insall/Burstein II.
>
> Q: And Zimmer adopted that design concept?
> A: Correct.

(Greig 2006 Dep. at 42-43). Zimmer argues that this exchange shows that, during Mr. Greig's 2006 deposition, Howmedica's attorney was asking leading questions and seeking admissions to confirm that Dr. Burstein – not Zimmer – made the decision to use the taper connection mechanism for the IB-II knee system. Zimmer further argues that additional supporting evidence reveals that this fact is beyond dispute. For example, Bruce Robie, an HSS engineer, who worked closely with Dr. Insall and Dr. Burstein on the design of the IB-II knee system, confirms that Dr. Burstein decided to use a tapered connection mechanism for the IB-II stem extensions well before the 1987 meeting. In his Declaration, Mr. Robie stated that: "During the process of designing the components for the IB-II knee system, sometime before June 3, 1985, Dr. Burstein made the decision to use a Morse-taper-type connection, augmented by a "captive screw," to connect the tibial stem extensions to the tibia tray . . . . Zimmer engineers or other staff did not make the decision to use  the Morse-taper-type connection for the stem extensions included in the IB-II knee system." (Robie Decl. at 1).  Mr. Robie had personal knowledge of this information because

he was the HSS engineer responsible for creating the design drawings in 1985 after Dr. Insall and Dr. Burstein designed the IB-II knee system.  (Robie Decl. at 1).

Zimmer claims that none of this testimony could have come as a surprise to Howmedica, because (in addition to Howmedica's attorney's eliciting this testimony from Mr. Greig in his 2006 deposition) Howmedica's own expert Dr. Burstein previously testified without reservation that he, and not Zimmer, designed and selected the Morse taper connection mechanism for the IB-II stem extensions. In a sworn declaration from Dr. Burstein in May 2007, which Howmedica later

filed with this Court (D. 373), Dr. Burstein stated: "The Insall-Burstein II knee system (see Exhibit 2) was commercially available in 1985. John Insall and I designed the Insall-Burstein II system to use a Morse taper connection as the structural means for connecting the stem extension to either the femoral component or tibial tray as shown below. The Insall-Burstein II knee system included an augmenting screw (which passed through the Morse taper on the tibial side) as a belt-and-suspenders measure to avoid disassociation of the components."  (Burstein Dep. at ¶ 16). Dr. Burstein confirmed the statement from his declaration during his deposition in July 2007. (Burstein Dep. at 94, 155-57).

According to Zimmer, notwithstanding this prior evidence, during Mr. Greig's deposition in 2008, after he had already explained that the 1987 meeting was about Zimmer's proposal for an alternative method of augmenting Dr. Burstein's taper connection, Howmedica's counsel confronted Mr. Greig with a series of leading questions. The questions were designed to persuade Mr. Greig to agree that the 1987 meeting "related to" the decision to use a tapered connection – a decision that Dr. Burstein had already made before the 1987 meeting – instead of a discussion

about Zimmer's proposal for a male taper with male augmenting threads, which Mr. Greig described when he was first asked about it. Zimmer points to the following exchange as a good example:

> Q: Okay. But during this [1987] meeting, there certainly was a
> discussion about the type of connection structure that would be
> used whether it was a threaded extension rod design as proposed
> by Zimmer or whether it was this taper and captive screw design,
> correct?
> A: Correct.
> Q: That related to the decision to use a taper correct?
> A: Correct.

(Greig 2008 Dep. at 58). In his errata sheet, Mr. Greig changed this last answer from "Correct" to: "No, that is not correct. It [the 1987 meeting] related to the decision to use a taper with a female thread or a male thread." Mr. Greig's errata sheet states that the reason for this change was to "clarify confusing testimony" and for "further clarity" Mr. Greig referred to his earlier deposition testimony, where he clearly explained his understanding of the 1987 meeting. Specifically, Mr. Greig referred to the testimony where he explained that Zimmer's 1987 proposal related to an alternative method for augmenting Dr. Burstein's tapered connection: "a male taper with a male screw on top so that we could eliminate the added piece of a captive screw." Zimmer concludes that Mr. Greig's errata sheet change was necessary to clarify Mr. Greig's answer and to ensure that his deposition testimony accurately reflects his understanding about the 1987 meeting.

Zimmer states that the rest of Mr. Greig's errata sheet changes that Howmedica now challenges are nearly identical to the one just discussed – same topic, the 1987 meeting; same type of change; and same reason for the change, to clarify the testimony and ensure that it is consistent with Mr. Greig's other testimony on this topic. The following exchange occurred shortly after the one just discussed:

Q: But you would – I'm sorry. But you would agree that that meeting [the 1987 meeting] at least relates to the decision to use a taper connection; correct?
A: Yes. I would agree with that.

(Greig 2008 Dep. at 60.)

In his errata sheet, Mr. Greig changed this answer to "No, it relates to the taper with a female or a male thread" and Mr. Greig referred to his earlier testimony about the 1987 meeting. Again, Zimmer states that Mr. Greig was clarifying his understanding that the 1987 meeting was not about selecting the tapered connection or changing from a tapered connection to a threaded connection, but was about Zimmer's proposal for augmenting the taper connection by adding male threading on the top part of the taper instead of using the taper with the female thread and captive screw augmenting method. Thus Zimmer maintains that Mr. Greig properly used his errata sheet to clarify his testimony on this point and to ensure that it was consistent throughout his deposition.

Zimmer further notes that shortly before the exchange quoted above (from page 60 of Mr. Greig's 2008 deposition transcript), Mr. Greig again explained to Howmedica's attorney that, during their discussions about the report, they may have been talking past each other, which was causing some confusion. Zimmer claims that Howmedica's attorney was asking Mr. Greig leading questions using the phrase "threaded extension rod," which is used in the 1987 trip report but is not defined. According to Zimmer, Howmedica's attorney appeared to be suggesting, and attempting to persuade Mr. Greig to agree, that, during the 1987 meeting, Zimmer suggested changing from Dr. Burstein's tapered connection mechanism to a different connection mechanism using only threads and no taper. As he testified when first questioned about Zimmer's proposal, Mr. Greig had a different understanding. So, in response to the persistent leading questions from

Howmedica's attorney, Mr. Greig again explained that "I think the reason there is this confusion is because what I am picturing in my head when I make this statement is a different design, a taper and this male threaded portion." (Greig 2008 Dep. at 59. See also Greig 2008 Dep. at 48 ("I think we're confusing what the screw thread is with what HSS had and what this [Zimmer] proposal was.")). Thus Zimmer again concludes that Mr. Greig's errata sheet clarifies his answers to a few of Howmedica's leading questions consistent with the explanations that he tried to offer to Howmedica's counsel during the deposition.

In the Declaration that Mr. Greig signed on October 6, 2008, Mr. Greig said that the discussion during the 1987 meeting "does not relate to the decision to use a taper connection, and is not related to consideration of changing from a taper connection to a screw connection." Greig Decl. At ¶ 6. During his deposition, Mr. Greig initially agreed that the 1987 meeting "at least relates to the decision to use a taper connection." But during the deposition, immediately after Mr. Greig agreed with counsel's question, Howmedica's counsel followed up by asking Mr. Greig

if his deposition testimony conflicted with his Declaration:

> Q: And, yet in your declaration you testified under oath that, excuse me, that the meeting does not relate to the decision to use a taper connection.
>
> Mr. LaDue: Objection, argumentative.
>
> Q: That was your sworn testimony in your declaration; correct?
> A: I can't – I can't answer why it appears in this document to conflict with what I just said.
>
> Q: But there is a conflict; correct?
> A: I think there is.

(Greig 2008 Dep. at 60).

In his errata sheet, Mr. Greig changed this last answer to "I do not think there is." He explained the reason for this change as follows: "Clarifying confusing testimony." In his errata sheet, Mr. Greig further explained that: "The various questions and answers related to threaded designs, tapered designs, and thread/taper combination designs is confusing but not conflicting between the declaration and the deposition. Refer to page 49 line 4-13, page 52 line 2-10, page 59 line 4-7, and page 61 line 17-22 to help clarify." Once again, Zimmer argues, Mr. Greig made an errata sheet change to clarify his answer about the 1987 meeting, which was originally confusing as a result of Howmedica's efforts (through leading questions) to characterize Zimmer's proposal for a "threaded extension rod" as a different design than the one that Mr. Greig described when he was first asked about it.

The last of the errata sheet changes that Howmedica challenges resulted from the following exchange during Mr. Greig's deposition:

> Q: So the meeting at HSS in April of '87 again related to
> consideration of changing from a taper to a screw connection;
> correct.
> A: I agree.
> Q: Okay.
> A: That it looks like that.

(Greig 2008 Dep. at 63).

In his errata sheet, Mr. Greig changed his answer from "I agree" to "No, to a taper and male screw combination connection." Zimmer argues that, again, Mr. Greig was properly clarifying confusing testimony and ensuring that his final deposition testimony accurately reflects his understanding that the 1987 meeting was about alternative augmenting methods. Mr. Greig's testimony highlighted part of the confusion during his deposition when Mr. Greig stated that "it looks like that." In other words, Mr. Greig recognized that the trip report "looks like" it relates to

changing from a taper connection mechanism to a threaded connection mechanism because of the undefined phrase "threaded extension rod." Zimmer states that Mr. Greig's errata sheet change helps eliminate the confusion and makes his answer consistent with his earlier deposition testimony on this point and the testimony that Mr. Greig may give if he testifies about this subject at trial.

Howmedica, however, strongly contends in reply to Zimmer's arguments, that Mr. Greig's errata changes were not made to clarify confusing testimony. Howmedica claims that the answers Mr. Greig gave at his deposition were clear and unambiguous. Howmedica also argues that Mr. Greig's errata changes were not made to correct confusing testimony, and that Zimmer has mischaracterized Mr. Greig's deposition testimony. Howmedica points out that Mr. Greig testified that:

(1) He did not remember what type of connection design the 1987 Trip Report referred to (see Greig Dep. at 52 ("My recollection was there was also this other consideration at that time for a male taper/male thread … but I don't recall the time frames of whether they were overlapping and whether it was specifically this.");

(2) The 1987 Trip Report may have referred to a simple stem extension with threads on the end (which is consistent with the documents description of a rejected "threaded extension rod") (see Greig Dep. at 52 ("We had a threaded connection rod for the Miller/Galante as well. This may be referring to that."); and

(3) Regardless of the nature of the connection, the 1987 Trip report "referred to the decision to use a Morse taper (see Greig Dep. at 60 ("Q. But you would agree that that meeting at least relates to the decision to use a taper connection; correct? A. Yes. I would agree with that.")

Howmedica argues that even if one accepts Zimmer's allegedly "unequivocal" evidence that Dr. Insall and Dr. Burstein had "already selected the tapered connection mechanism years before the meeting," Zimmer cannot dispute that the 1987 Trip report dealt with the decision to keep the

previous HSS Morse taper design rather than switch to a "threaded extension rod," and therefore "refers or relates to the decision to use a Morse taper." Howmedica further rehashes its earlier claims that several other facts confirm that Mr. Greig's deposition testimony cannot credibly be called "confusing" or ambiguous. For example:

(1)    The questions posed to Mr. Greig by Howmedica's counsel used the identical language Mr. Greig used in his declaration. (Compare D. 682 at Ex. B, Greig Decl. at ¶ 6 ("The meeting does not relate to the decision to use a taper connection…") with Ex. 1, Greig Dep. at 60-61 ("Q. But you would agree that that meeting at least relates to the decision to use a taper connection; correct? A. Yes, I would agree with that.").) Zimmer and Mr. Greig cannot credibly claim that the same language Mr. Greig used in his own declaration is suddenly "confusing" when used at his deposition.

(2)    Howmedica's counsel asked Mr. Greig different variations of the same question at least three different times to ensure that there was no confusion. (See Greig Dep. at 58, 60-61 and D. 682 at 6.)

(3)    Mr. Greig was represented by Zimmer's counsel at his deposition, and counsel never objected to any of the allegedly "confusing" questions. (See Greig Dep. at 58, 60-61 and D. 682 at 6.)

(4)    Mr. Greig was given an explicit opportunity to explain his testimony at his deposition, but he saw no need at that time to "clarify" his testimony. (See Greig Dep. at 60 ("Q. And yet in your declaration you testified under oath that, excuse me, that the meeting does not relate to the decision to use a taper connection. … That was your sworn testimony in your declaration, correct? A. I can't – I can't answer why it appears in this document to conflict what I just said.").)

After studying the submitted evidence and legal authorities, this court concludes that Howmedica's motion should be denied.  The real issue raised by the motion is the credibility of Mr. Greig, considered in light of the nature of questioning to which he was subjected. Considering all the evidence relating to the Trip Report, it is clearly imaginable that Mr. Greig was confused or, at the least, did not understand the need to be more precise than he was in response to the deposition questions.   By denying the motion, the result is that both the

deposition and errata sheet become evidence in this case. <u>See e.g.</u>, <u>Dunning</u>, <u>supra</u>.  The alleged

conflicts and confusion, as well as credibility, can ultimately be determined by the trier of fact

when appropriate.

<div align="center">

<u>Conclusion</u>

</div>

Based on the foregoing, Howmedica's motion to strike Kevin Grieg's errata sheet [DE

682] is hereby DENIED.


 Entered: June 25, 2009.


<div align="right">

<u>s/ William C.  Lee</u>
William C. Lee, Judge
United States District Court

</div>